[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-10173
_____

D.C. Docket No. 9:16-cv-80655-RLR


JAMES TRACY,

                                                          Plaintiff-Appellant,

versus

FLORIDA ATLANTIC UNIVERSITY BOARD OF TRUSTEES,
CHRISTOPHER BEETLE,
JOHN W. KELLY,
HEATHER COLTMAN,
DIANE ALPERIN,
FLORIDA EDUCATION ASSOCIATION,
ROBERT ZOELLER, JR.,
MICHAEL MOATS,

                                                          Defendants-Appellees,

ANTHONY BARBAR, et al.,

                                                          Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(November 16, 2020)

Before MARCUS, JULIE CARNES, and KELLY,[*] Circuit Judges.

JULIE CARNES:

Following the December 14, 2012 Sandy Hook Elementary School shooting in Newtown, Connecticut, where twenty children and six adults lost their lives, Plaintiff James Tracy attracted national news media attention for publicly questioning whether the massacre had in fact occurred.  At the time, Plaintiff held a tenured position in the School of Communication and Multimedia Studies at Florida Atlantic University and maintained a personal online blog, called the "Memory Hole Blog," where he criticized the media and explored conspiracy theories.  The University did not ask Plaintiff to stop blogging but did request that he post an adequate disclaimer on his blog and report his outside activities, as required under the faculty's collective bargaining agreement ("CBA").  As part of a settlement agreement, Plaintiff complied in part, posting a University-approved disclaimer.  But he adamantly refused to report his blog, arguing that the blog did

_____

[*] Honorable Paul J. Kelly, Jr., United States Circuit Judge for the Tenth Circuit, sitting by designation.

2

not qualify as a "Reportable Outside Activity" under the CBA's "Conflict of Interest/Outside Activities" policy ("the Policy").  Approximately two years later, after Plaintiff refused multiple requests to submit outside-activity reports and ignored warnings that his recalcitrance could result in termination, the University fired him for insubordination.

Plaintiff sued the University and associated individuals alleging that the Policy was unconstitutionally vague, that his termination breached the CBA, and that the University had used his insubordination as a pretext for First Amendment retaliation.  Concluding that Plaintiff had failed to exhaust his remedies and that his vagueness challenge as to the Policy was not viable, the district court granted summary judgment against Plaintiff on both his constitutional and breach-of-contract claims.  The court denied summary judgment as to Plaintiff's First Amendment retaliation claim, sending this claim to trial.  The jury rejected Plaintiff's First Amendment retaliation claim after a nine-day trial.  On appeal, Plaintiff asks us to reverse the district court's summary judgment rulings and to overturn the jury verdict.  We decline to do so and affirm the decisions below.

3

## I.    PROCEDURAL HISTORY

Plaintiff's Second Amended Complaint asserted six claims, only five of which are at issue on appeal.[1]  Claims 1, 3, and 4 were constitutional challenges asserted under 42 U.S.C. § 1983.  In Claim 1, Plaintiff alleged that Defendants had terminated him in retaliation for exercising his constitutionally protected speech rights.  Claims 3 and 4 alleged that the Policy was vague and overbroad, both facially and as applied to Plaintiff.  Claim 5 requested a declaratory judgment that the Policy was unconstitutional.  Finally, in Claim 6, Plaintiff alleged that the University had breached the CBA by firing him.

Defendants moved for summary judgment on all claims.  In response, Plaintiff moved for partial summary judgment on Claims 1, 3, 4, and 5, arguing that the evidence showed he was terminated in retaliation for his protected speech and that the Policy was unconstitutional.  The district court denied Plaintiff's motion.  As for Defendants' motion, the district court granted summary judgment to Defendants on Claims 2–6, but denied the motion with respect to Claim 1:  the First Amendment retaliation claim.

At trial, the jury returned a verdict for the University on Claim 1, finding "[t]hat Professor Tracy's blog speech was [not] a motivating factor in FAU's

---

[1]  Plaintiff alleged in Claim 2 that his union conspired with the University to interfere with his civil rights.  On appeal, Plaintiff does not challenge the district court's grant of summary judgment to Defendants on that claim.

decision to discharge him from employment." Plaintiff moved for judgment as a matter of law, arguing that the jury could not have reasonably found that his speech did not motivate the University to fire him. In the alternative, Plaintiff moved for a new trial, arguing that the verdict was against the great weight of the evidence, and that the court had abused its discretion in excluding a transcript of a Faculty Senate meeting where professors complained about the Policy. The district court denied Plaintiff's motions. This appeal followed.

## II.    DISCUSSION

### A.    Summary Judgment

The district court granted summary judgment to the University on Plaintiff's breach-of-contract claim (Claim 6), on his § 1983 claims that the Policy was facially unconstitutional (Claim 3) and unconstitutional as applied to him (Claim 4), and on his declaratory-judgment claim that the Policy should be declared unconstitutional (Claim 5). We affirm the district court's summary judgment rulings.

This Court reviews constitutional questions *de novo*. *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1239 (11th Cir. 2018). We also review *de novo* a district court's grant of summary judgment, viewing the evidence in the light most favorable to the non-moving party. *Id.* at 1239–40. "The court shall grant summary judgment if the movant shows that there is no

5

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### 1.    Claim 6: Breach-of-contract claim

The district court correctly concluded that Plaintiff's failure to exhaust the CBA's mandatory grievance-and-arbitration procedures barred his claim that the University breached the CBA by firing him (Claim 6). "An employee claiming a breach by his employer of the collective bargaining agreement is bound by the terms of that agreement as to the method for enforcing his contractual rights" and "must attempt to use the grievance and arbitration procedure established by the employer and union in the collective bargaining agreement prior to bringing suit in federal court." *Redmond v. Dresser Indus., Inc.*, 734 F.2d 633, 635 (11th Cir. 1984).

Plaintiff concedes that he did not grieve his disputes in accordance with the CBA. He argues, however, that the grievance procedure was optional and that grieving would have been futile. Plaintiff's arguments are unpersuasive. The CBA clearly provides that the grievance procedure was mandatory, stating that that the procedure "shall be the sole and exclusive method for resolving the grievances of employees." As to his claim of futility, Plaintiff provides no support for his conclusory statement that "filing a grievance would have been a meaningless gesture." As the district court correctly observed, Plaintiff was not at the mercy of

6

the University's judgment because the collective bargaining agreement provided for an independent arbitrator. Accordingly, the district court did not err in granting summary judgment on Plaintiff's breach-of-contract claim.

### 2. Claims 3–5: Constitutional claims challenging the Policy

Although we affirm the district court on the constitutional claims, we get there by a different route than did that court. The district court granted summary judgment to the University on Plaintiff's constitutional claims challenging the Policy under the First and Fourteenth Amendments (Claims 3–5), ruling that Plaintiff failed to exhaust those claims through the CBA's grievance procedure and, in any event, that the CBA's contractual terms, unlike positive law, are not subject to a challenge on the ground of vagueness.[2]

---

[2] The district court also indicated its belief that Plaintiff lacked appellate standing to challenge the district court's grant of summary judgment on his claims that the Policy was unconstitutional because the jury's determination that the University did not fire Plaintiff based on his speech left Plaintiff with no standing to challenge that policy. We disagree with that assessment. "The primary limitation on a litigant's appellate standing is the adverseness requirement," under which "[o]nly a litigant who is aggrieved by the judgment or order may appeal." *Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1353–54 (11th Cir. 2003) (alteration accepted) (quotation marks omitted). The jury's finding that the University did not fire Plaintiff for his speech did not decide Plaintiff's claim that the University fired him for failing to comply with what he asserts to be an unconstitutional policy. In any event, even if one concluded that the jury's finding precluded a reversal of the district court's grant of summary judgment on the constitutional claims, Plaintiff has standing to challenge the summary judgment ruling because he has appealed that jury verdict, meaning a successful appeal could result in a new trial.

The district court also ruled that Plaintiff had waived his constitutional challenge to the Policy because, as a former union president and as a union member, Plaintiff had accepted the CBA's terms, one of which terms included the policy that Plaintiff now challenges. Defendants expressly abandoned their waiver defense at trial, however, and that ruling is not before us on appeal.

In so explaining its ruling, the district court relied on *Hawks v. City of Pontiac*, 874 F.2d 347 (6th Cir. 1989).  In that case, the plaintiff police officer had been demoted after violating a residency requirement in a collective bargaining agreement.  *Id.* at 348–49.  The Sixth Circuit held that the officer could not challenge the requirement because it was a contractual term that "may not be characterized as a positive law subject to due process challenge for vagueness" and the requirement's interpretation was subject to the collective bargaining agreement's grievance and arbitration process.  *Id.* at 349–50.  *Hawks* has some intuitive appeal because the vagueness doctrine concerns fair notice, and parties to a contract are ordinarily presumed to understand terms to which they have agreed. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (noting that the vagueness doctrine addresses "[a] fundamental principle in our legal system . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required"); *see also* 27 Williston on Contracts § 70:114 (4th ed.) ("One who signs or accepts a written contract, in the absence of fraud or other wrongful act on the part of another contracting party, is conclusively presumed to know its contents and to assent to them.").

Nevertheless, there are reasons to doubt the viability of the Sixth Circuit's reasoning, given the existence of caselaw indicating that § 1983 claims generally need not be exhausted and that collective bargaining agreements are not immune to

8

constitutional challenges, plus the fact that courts regularly entertain vagueness challenges to policies that do not qualify as positive law. *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 515–16 (1982) (holding that § 1983 claims need not be exhausted unless Congress has "carved out . . . [an] exception to the no-exhaustion rule"); *Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1226–27 (11th Cir. 2006) ("The Supreme Court and this Court have held that there is no requirement that a plaintiff exhaust his administrative remedies before filing suit under § 1983." (citing *Patsy*, 457 U.S. at 516)); *Narumanchi v. Bd. of Trustees of Connecticut State Univ.*, 850 F.2d 70, 73 (2d Cir. 1988) ("Nor is it permissible, in light of *Patsy v. Board of Regents, supra*, to require initial recourse to available state proceedings, including union grievance proceedings, for the enforcement of First Amendment rights protectable in federal court pursuant to section 1983."); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273–74, 284 (1986) (holding that a contractual provision in a collective bargaining agreement, which "operate[d] against whites and in favor of certain minorities," violated the Equal Protection Clause); *see, e.g.*, *Doe v. Valencia Coll.*, 903 F.3d 1220, 1232–33 (11th Cir. 2018) (concluding that a university's code of conduct, which did not qualify as positive law, was neither facially overbroad nor unconstitutionally vague); *see also Hamilton v. U.S. Postal Serv.*, 746 F.2d 1325, 1328 (8th Cir. 1984) (holding that a

9

collective bargaining agreement's standard for discipline was not unconstitutionally vague).

That said, we need not accept or reject the Sixth Circuit's reasoning to resolve this appeal, as Plaintiff loses on the merits of his challenge. *See Wetherbee v. S. Co.*, 754 F.3d 901, 905 (11th Cir. 2014) (noting that we may affirm a district court's summary judgment ruling on any ground supported by the record). Thus, without deciding the issue, we assume for the purposes of this appeal that Plaintiff could constitutionally challenge the Policy on vagueness grounds.

In evaluating the merits of Plaintiff's challenge, we note first that the CBA's Policy has two components. First, the Policy includes a reporting requirement, under which a faculty member who proposes to engage in a "Reportable Outside Activity" must submit "a detailed written description of the proposed activity." The CBA defines "Reportable Outside Activity" as "any *compensated or uncompensated professional practice*, consulting, teaching or research, which is not part of the employee's assigned duties and for which the University has provided no compensation." (Emphasis added.) Second, the Policy includes a prohibition on engaging in any "conflict of interest," which is defined as including (1) "any conflict between the private interests of the employee and the public interests of the University," (2) "any activity which interferes with the full performance of the employee's professional or institutional responsibilities or

10

obligations," and (3) "any outside teaching employment." Thus, the Policy's reporting requirement allows the University to assess whether a professor's outside activity constitutes a conflict of interest, while the Policy's prohibition on conflicts of interest provides a mechanism for the University to prohibit an outside activity that so qualifies.

Plaintiff raises two primary arguments, which roughly correspond to the Policy's two components. First, he argues that the reporting requirement is unconstitutionally vague because the term "professional practice" in the definition of "Reportable Outside Activity" does not give fair notice to professors as to what must be reported. In particular, he contends that the term "professional practice" is undefined and broad enough to encompass any outside activity because the Policy states that the term includes both "compensated and uncompensated" activities.

Plaintiff's argument is unpersuasive. "The void-for-vagueness doctrine serves two central purposes: (1) to provide fair notice of prohibitions, so that individuals may steer clear of unlawful conduct; and (2) to prevent arbitrary and discriminatory enforcement of laws." *Mason v. Fla. Bar*, 208 F.3d 952, 959 (11th Cir. 2000). Accordingly, "[v]agueness arises when a statute is so unclear as to what conduct is applicable that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Id.* at 958.

11

Here, the term "professional practice" is not vague, especially when considered in context. Further, the fact that the Policy does not define "professional practice" is not dispositive. When a term is left undefined, "we normally construe it in accord with its ordinary or natural meaning." *See Smith v. United States*, 508 U.S. 223, 228 (1993); *accord F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994). On that score, the ordinary meaning of "professional practice" is readily understandable, and its scope is limited. "Practice" means "to make use of" or "to carry on or engage in." *Practice*, Merriam-Webster Unabridged, https://unabridged.merriam-webster.com/unabridged/practice (last visited Nov. 3, 2020). "Professional" is generally defined as "of, or relating to, or characteristic of a profession or calling" or "engaged in one of the learned professions or in an occupation requiring a high level of training and proficiency." *Professional*, Merriam-Webster Unabridged, https://unabridged.merriam-webster.com/unabridged/professional (last visited Nov. 3, 2020). Thus, "professional practice" refers to engaging in an activity characteristic of one's profession. That the Policy uses the term "professional practice" in this sense is further confirmed by the fact that it appears in a list of activities typically engaged in by academic professionals, such as "consulting," "teaching," and "research." *See Third Nat'l Bank in Nashville v. Impac Ltd., Inc.*, 432 U.S. 312, 322 (1977) ("It is a familiar principle of statutory construction that words grouped in a list should

12

be given related meaning."); *see also Ace Am. Ins. Co. v. Wattles Co.*, 930 F.3d 1240, 1258–59 (11th Cir. 2019) (discussing the "associated words canon"). Finally, because the plain meaning of "professional practice" limits the term's application to activities that are "professional" in nature, the term does not encompass any and all outside activities, as Plaintiff contends.

While certain activities might less clearly connote a professional practice than would other activities, that possibility does not render the Policy unconstitutionally vague. *See United States v. Williams*, 553 U.S. 285, 306 (2008) ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."); *see also Fox Television Stations*, 567 U.S. at 253 ("[A] regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved."). "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). In short, we conclude that the plain meaning of "professional practice" provides fair notice to persons of ordinary intelligence as to what is reportable under the Policy and does not present a risk of arbitrary or discriminatory enforcement.

Plaintiff's vagueness challenge fails for the additional reason that the reporting requirement clearly applied to his own particular unreported activity. *Cf. Valencia Coll.*, 903 F.3d at 1233 ("[A] plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim . . . ." (alteration and ellipsis in original) (quotation marks omitted)). As his union president later testified, the blog clearly constituted "professional practice" because Plaintiff was a media expert who taught courses such as "The Culture of Conspiracy," and the blog closely mirrored what he did professionally.

Finally, we find meritless Plaintiff's overarching First Amendment arguments that the Policy's reporting requirement is facially overbroad and constitutes a content-based restriction on speech. A facial-overbreadth challenge requires a showing that "the statute punishes a substantial amount of protected free speech." *Valencia Coll.*, 903 F.3d at 1232 (emphasis omitted) (quotation marks omitted). But the reporting requirement does not punish or restrict *any* speech; it requires only that faculty *report* certain types of speech activities. That University officials must perform a "cursory examination" of a professor's speech content—which is at most what the Policy requires to assess whether an activity qualifies as a professional practice—does not transform the reporting requirement into a content-based regulation. *See Hill v. Colorado*, 530 U.S. 703, 721–22 (2000) ("We have never held, or suggested, that it is improper to look at the content of an

14

oral or written statement in order to determine whether a rule of law applies to a course of conduct.").  Nor has Plaintiff offered any persuasive argument why, as applied to him, the requirement became a content-based regulation.  Accordingly, Plaintiff's facial and as-applied First Amendment challenges to the Policy's reporting requirement fail.

Plaintiff's second argument is that the Policy's definition of "conflict of interest," combined with its prohibition of such conflicts, operates as a prior restraint on speech that is unconstitutional under the unbridled-discretion doctrine. The unbridled-discretion doctrine generally applies to licensing or permitting schemes that require individuals to obtain permission before engaging in speech activities.  *See, e.g.*, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 769–70 (1988).  Under the doctrine, a licensing scheme that "allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity" can be challenged as facially unconstitutional.  *Id.* at 755–56. "To avoid unbridled discretion, the permit requirements should contain narrowly drawn, reasonable, and definite standards to guide the official's decision." *Bloedorn v. Grube*, 631 F.3d 1218, 1236 (11th Cir. 2011).

Here, Plaintiff contends that the definition of "conflict of interest," which includes any activity that conflicts with "the public interests of the University," fails to adequately constrain the University's authority to prohibit outside

15

activities.  At first glance, Plaintiff's argument is not entirely implausible.  *See Lakewood*, 486 U.S. at 769–70, 772 (holding that a licensing ordinance, which gave the mayor authority to deny a permit if he deemed it "necessary and reasonable," was facially unconstitutional under the unbridled-discretion doctrine because "nothing in the law as written require[d] the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application").

On closer inspection, however, Plaintiff's argument suffers from a critical defect.  Even assuming that the Policy applies to some speech activities, Plaintiff's unbridled-discretion claim fails because he has, at most, shown a "hypothetical constitutional violation[] in the abstract."  *Granite State Outdoor Advert., Inc. v. City of St. Petersburg*, 348 F.3d 1278, 1282 (11th Cir. 2003) (noting that "we [were] reluctant to invalidate an entire legitimately-enacted ordinance absent more of a showing it is as problematic as [the plaintiff] claims").  The Supreme Court has held that, even when "unduly broad discretion" creates "a risk that [a licensing official] will favor or disfavor speech based on its content," such "abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323, 324–25 (2002); *Wright v. City of St. Petersburg*, 833 F.3d 1291, 1299 (11th Cir. 2016) ("A discriminatory

enforcement claim can be brought only if a pattern of selective enforcement appears.").

Here, Plaintiff submitted no evidence that the University has prohibited any professor from engaging in any speech activity, much less that the University has relied on a "public interest" rationale in doing so. Plaintiff's failure to identify even a single instance in which the University has determined that an outside speech activity constitutes a prohibited "conflict of interest" is telling, as the trial evidence indicated that the Policy's language has been part of the CBA for well over a decade. Indeed, Plaintiff's claim that the "conflict of interest" definition is facially overbroad is purely speculative. As the party with "the burden of demonstrating, from the text of the law and from *actual fact*, that substantial overbreadth exists," Plaintiff has not shown "a *realistic danger* that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Valencia Coll.*, 903 F.3d at 1232 (emphasis added) (quotation marks omitted).

In short, we decline to require "a degree of rigidity that is found in few legal arrangements" based on nothing more than a hypothetical fear that the University might discriminate based on speech content when determining which outside activities constitute a "conflict of interest." *Thomas*, 534 U.S. at 325. Indeed, Plaintiff could have tested the breadth of the conflict-of-interest prong by reporting

17

the activity in question.  At that point, the University could have decided whether or not the conduct represented a conflict of interest and responded accordingly.[3]  It was Plaintiff's decision not to do so.  Thus, Plaintiff's challenge to the Policy's conflict-of-interest provision fails on the merits.

Given that Plaintiff's constitutional challenges to the Policy asserted in Claims 3 and 4 fail on the merits, his declaratory-judgment claim based on those same grounds (Claim 5) fails as well.  Accordingly, we affirm the district court's grant of summary judgment to the University on Claims 3–5.[4]

---

[3]  Indeed, the district court cited a lack of ripeness as an alternative ground for granting summary judgment to the University on Plaintiff's as-applied challenge, found in Claim 4.  By failing to address this ruling in his opening brief, Plaintiff has arguably abandoned Claim 4.  *Starship Enterprises of Atlanta, Inc. v. Coweta Cty.*, 708 F.3d 1243, 1252 n.12 (11th Cir. 2013).  In any event, we conclude that the district court's ripeness ruling was correct insofar as it addressed Plaintiff's challenge to the University's application of the Policy's "conflict of interest" definition.  "The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes."  *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997).  Here, Plaintiff's as-applied challenge to the conflict-of-interest provision was unripe because he failed to report his blog, thereby depriving the University of an opportunity to determine whether his blog speech constituted a prohibited "conflict of interest" under the Policy.  *See id.* at 590 (holding that a First Amendment as-applied challenge to a zoning ordinance was unripe because the plaintiff did not satisfy its "obligation to obtain a conclusive response from someone with the knowledge and authority to speak for the City regarding the application of the zoning scheme to [the plaintiff's] proposal").  In other words, the University never *applied* the conflict-of-interest provision and therefore never restricted Plaintiff's speech.

[4]  On appeal, Plaintiff argues that we must reverse the district court's grant of qualified immunity to two of the individual defendants on Claim 1 if we reverse the court's summary judgment ruling on Claims 3–5.  Because we affirm the district court's summary judgment rulings, we obviously do not disturb the district court's qualified-immunity rulings.

18

### B.    Motions for Judgment as a Matter of Law and for a New Trial

Plaintiff not only attacks the district court's grant of summary judgment as to certain claims, but also challenges the jury's verdict against him on the one claim that went to trial:  the retaliation claim.  Arguing that no reasonable juror could have found that his blog speech did not motivate the University to fire him, Plaintiff argues that the district court erred in denying his motion for judgment as a matter of law and abused its discretion in denying his motion for a new trial. Plaintiff, however, cherry-picks the evidence supporting his theory of the case, while ignoring the substantial body of evidence supporting the jury verdict. Accordingly, his contentions on this point are unpersuasive.

We review *de novo* a district court's denial of a renewed motion for judgment as a matter of law, considering the evidence in the light most favorable to the nonmoving party.  *EEOC v. Exel, Inc.*, 884 F.3d 1326, 1329 (11th Cir. 2018), *cert. denied sub nom. Travis v. Exel, Inc.*, 139 S. Ct. 1373 (2019).  Judgment as a matter of law is appropriate where a court finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party on [an] issue."  Fed. R. Civ. P. 50(a)(1).  "We will not second-guess the jury or substitute our judgment for its judgment if its verdict is supported by sufficient evidence."  *Exel*, 884 F.3d at 1329 (quoting *Lambert v. Fulton Cty.*, 253 F.3d 588, 594 (11th Cir. 2001)).

19

We review for an abuse of discretion a denial of a motion for new trial. *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1231 (11th Cir. 2012). "A judge should grant a motion for a new trial when the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quotation marks omitted). "Because it is critical that a judge does not merely substitute his judgment for that of the jury, new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Id.* (quotation marks omitted).

To establish that he was discharged in retaliation for protected speech, Plaintiff had to prove, among other things, that his speech played a "substantial part" in the University's decision to terminate him. *Anderson v. Burke Cty.*, 239 F.3d 1216, 1219 (11th Cir. 2001). The jury found that Plaintiff had failed to do so, as it found that Plaintiff's blog speech was not a motivating factor in the University's decision. We conclude that there was more than sufficient evidence to support the jury's verdict.

First, Vice Provost Diane Alperin and Dean Heather Coltman, who were involved in the decision to fire Plaintiff, testified that the University terminated

20

Plaintiff for insubordination, that the University would not have disciplined him if he had submitted complete outside-activity reports, and that they never asked Plaintiff to stop writing his blog. And contrary to Plaintiff's argument, this "self-serving testimony" was not "the only evidence [the University] offered in support of its motivations."

The record shows that the University waged a multi-year battle to get Plaintiff to comply with his obligation to report outside activities. The administration told Plaintiff to file an outside-activity form in 2013. He refused to do so; instead he argued that he did not need to report his blog. Then, in 2015, Plaintiff instigated a new conflict over the reporting requirements when he refused to accept the "Terms and Conditions" of his annual academic assignment, one of which terms included an acknowledgement that faculty must report outside activities. Rather than agreeing to the "Terms and Conditions" and simply reporting his blog, Plaintiff insisted that the University clarify in writing that his blog could not constitute a conflict of interest.

Accordingly, in November 2015, the University sent Plaintiff a Notice of Discipline, which gave him 48 hours to submit outside-activity reports and warned that failure to do so would constitute insubordination. When Plaintiff did not submit the forms and expressed confusion about the Policy, the University extended the deadline, warning him that failure to comply with the new deadline

21

could result in termination.[5]  But Plaintiff did not meet that deadline either.

Instead, Plaintiff untimely submitted incomplete outside-activity reports that failed

to identify his blog.  Due to his failure to timely file complete outside-activity

reports, the University sent a final Notice of Proposed Discipline, which warned

Plaintiff that he would be terminated if he did not respond within ten days.

Astonishingly, Plaintiff did not respond and was terminated based on his own

default.[6]

Given the University's multiple warnings that Plaintiff was required to file

outside-activity reports and Plaintiff's repeated refusal to do so, there is little doubt

that Plaintiff was insubordinate.  Indeed, Plaintiff privately confessed to his union

president that his conduct was "cut-and-dry" insubordination and that he had not

complied with University directives because he believed his tenure status would

insulate him against any discipline.  Moreover, according to Vice Provost Alperin,

Plaintiff was not the only faculty member who was fired for insubordination after

failing to complete outside-activity reports.  Given this evidence, and the

undisputed fact that the University had allowed Plaintiff to continue blogging for

---

[5]  Notably, while Plaintiff feigned ignorance as to whether he should report his Memory Hole Blog, his union president advised him to report the blog because it was "in line with what [Plaintiff] did professionally, the conspiracy theories, the media critiquing, media criticism, . . . [things] that were arguably an extension of what he did professionally."

[6]  Plaintiff blamed his failure to respond on his union attorney's incompetence.

22

over two years, a reasonable jury could have found that Plaintiff's insubordination—not his blog speech—was the University's sole motivation for firing him.

Although we agree that Plaintiff introduced some circumstantial evidence of First Amendment retaliation, the jury was entitled to weigh the evidence. It did so, and it found for the University. *See McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (holding that it is the jury's role at trial to weigh conflicting evidence and determine the credibility of witnesses). Because sufficient evidence clearly supported the jury's finding and because we cannot say that the jury's verdict was against the weight of the evidence, we affirm the district court's denial of Plaintiff's renewed motion for judgment as a matter of law and motion for a new trial.

## C.    Exclusion of the Faculty Senate Meeting Transcript

On appeal, Plaintiff argues that the court abused its discretion in excluding an excerpt of the transcript of a September 2015 Faculty Senate meeting, which excerpt captured a heated exchange over the Policy by faculty members. We review evidentiary rulings for an abuse of discretion. *U.S. Steel, LLC, v. Tieco, Inc.*, 261 F.3d 1275, 1286 (11th Cir. 2001). "An error on an evidentiary ruling will result in the reversal of a jury's verdict only if a party establishes a substantial prejudicial effect or a manifest injustice." *Id.* We conclude that the district court

did not abuse its discretion when it denied admission of this transcript. Accordingly, we affirm the court's evidentiary ruling.

This Faculty Senate meeting transcript that Plaintiff sought to introduce at trial reflected much antagonism by some faculty members as to the CBA Policy. Several professors expressed confusion about what outside activities were reportable under the Policy. Others took umbrage at the University's follow-up inquiries concerning certain activities that were reported. Vice Provost Alperin commented that the University had been working to clarify the outside-activity form. Finally, a faculty member who was running the meeting said that addressing the professors' concerns would be premature because he did not yet know the relevant facts, but that their complaints could be the subject of a future meeting.

The district court ruled that the transcript contained a great deal of inadmissible hearsay but, more importantly, that its admission would violate Federal Rule of Evidence 403. The court reasoned that the angry remarks of some of the professors, which did not concern Plaintiff's specific case, would focus the jury on the wisdom of the Policy, not on the question properly before the jury: whether the University had terminated Plaintiff because of his blog or instead because of his insubordination. As such, the transcript not only lacked probative value, but it also created a substantial risk of unfair prejudice and jury confusion.

We find no error in the district court's exclusion of this evidence pursuant to Rule 403, as we agree with that court's reasoning. Rule 403 permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.[7] Given that the professors' pique was the predominant focus of the Faculty Senate meeting, there was a serious risk that admitting the transcript would cause the University to suffer unfair prejudice, forcing it to defend its character against inadmissible claims concerning other individuals, while distracting the jury from their central obligation to decide the issue before them.

Moreover, the district court correctly found that statements regarding faculty confusion had little probative value for the core issue at trial—whether the University fired Plaintiff for his speech rather than for his admitted insubordination. In seeking to introduce evidence of purported confusion by some faculty members about the Policy, Plaintiff sought to corroborate his claim that he was confused about the Policy, which he said might help to explain why he had

---

[7] We reject Plaintiff's argument that the professors' complaints about the University's enforcement of the Policy were relevant to show the effect of these remarks on Plaintiff and the University. As an initial matter, there is no evidence that Plaintiff was at the meeting. In any event, whether Plaintiff and the University knew that some professors disliked the Policy or that some professors indicated their confusion about the policy was irrelevant to whether the University fired Plaintiff because he wrote a blog.

acted in an insubordinate manner.  But whether or not another faculty member was uncertain whether that member's particular activity was reportable had nothing to do with whether Plaintiff was confused about whether his own blogging activities met the reporting requirement.  Moreover, as the district court correctly noted, the transcript evidence was cumulative of other evidence introduced by Plaintiff in support of his claim that he was confused.

In short, we conclude that the district court did not abuse its discretion in excluding the Faculty Senate meeting transcript.

## III.    CONCLUSION

After careful consideration, and with the benefit of oral argument, we affirm the district court's summary judgment rulings and its denial of Plaintiff's post-trial motions for judgment as a matter of law and for a new trial.

**AFFIRMED.**